UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

IRA GREEN, INC.,

                  Plaintiff,

     v.

J.L. DARLING, CORP.,

                  Defendant.

CASE NO. 3:11-cv-05796-RJB

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT AND
MOTIONS TO STRIKE

     This matter comes before the Court on Plaintiff Ira Green, Inc.'s Motion for Summary

Judgment (Dkt. 58) and Defendant J.L. Darling Corp.'s Motion for Partial Summary Judgment

(Dkt. 59).  The parties also filed several Motions to Strike.  Dkts. 72, 90, 100, 101, and 102.  The

Court has considered the pleadings filed in support of and in opposition to the motions and the

file herein.

I.       <u>UNCONTESTED FACTS</u>

**1.  Darling's '940 Patent**

1    Defendant J.L. Darling, Corp. (Darling) has sold all-weather paper, called Rite in the

2    Rain (RITR) paper, for decades, but its present form is the result of a years'-long inventive

3    process that led to the development of a patented all-weather paper.  Dkt. 60, at 2.  Darling was

4    issued a patent on March 8, 2005, entitled "Weatherproof Sheets for Copying, Printing and

5    Writing and Methods Related Thereto" (U.S. Pat. No. 6,863,940) ('940 patent).  Dkt. 61-2.

6    Darling's '940 patent did not cover books or notepad products comprising a plurality of sheets; it

7    only covered single sheets and the method for making those sheets.  Dkts. 75-1, at 7-8; 75-2.

8        **2.  STORM SAF Notebooks**

9    In the 1980s, Brigade Quartermasters, Ltd. (Brigade) created STORM SAF, a trademark

10   that referred to all-weather paper notebooks.  Dkt. 58-3, at 3, 18-19.  Shortly thereafter, Darling

11   began manufacturing STORM SAF all-weather notebooks for Brigade.  Dkt. 58-3, at 18, 39.

12   Darling, as manufacturer of the STORM SAF notebooks, placed the STORM SAF label on the

13   notebook covers, inserted its RITR paper inside the STORM SAF notebook covers, and printed

14   the '940 patent marking on the notebook back cover.  Dkt. 58-3, at 20-23.  Brigade, as distributor

15   of the STORM SAF notebooks, sold the notebooks to the Army and Air Force Exchange

16   Services (AAFES), a quasi-governmental entity that operates retail outlets on military bases.

17   Dkt. 58-3, at 4-6.

18       Darling had no contractual relationship with Brigade but instead fulfilled purchase orders

19   as they were submitted.  Dkt. 60, at 4.  By 2009, Darling would only manufacture the STORM

20   SAF notebooks to Brigade on a prepaid basis.  *Id.*

21       **3.  Green's Purchase of Brigade**

22   In 2009, Branch Banking & Trust Company foreclosed on Brigade due to financial

23   difficulties at Brigade.  Dkt. 61-1, at 3.  In January 2010, Plaintiff Ira Green, Inc. (Green)

24

1    purchased Brigade.  Dkts. 61-1, at 4; 71-1, at 12-34.  Following Green's acquisition of Brigade,

2    Darling filled outstanding purchase orders and shipped some STORM SAF notebooks to Green.

3    Dkt. 58-3, at 41.  In January 2010, Green discussed with Darling the possibility of continuing the

4    manufacturer-distributor relationship.  Dkt. 60, at 4.  Darling elected not to use Green as a

5    distributor.  *Id.*  Instead, Darling chose to sell its products directly to AAFES using a third party

6    manufacturer's representative, an entity called Military Sales & Service Company (MSS).  *Id.*  In

7    January 2010, Darling informed Green that it would no longer sell RITR products to Green for

8    distribution to AAFES.  *Id.*

9         **4.  Green's New Chinese Paper**

10        Shortly after January 2010, Green obtained a new source of waterproof paper from China

11   and proceeded to sell notebooks using the new Chinese paper under the STORM SAF trademark.

12   Dkt. 61-1, at 9.   Green did not place any 'made in China' labels on its notebooks from its first

13   sale until sometime after March 2, 2011, when a Customs and Border Patrol Agent ordered

14   Green to place the 'made in China' label on Green's notebooks.  Dkts. 87-3, at 5-7; 87-4, at 2-6.

15        **5.  Alleged Defamatory Statements about Green's Chinese Paper**

16        In May 2011, authorized by Darling's Co-President, Todd Silver (Dkt. 73-5, at 19-20),

17   Darling employees sent emails to military personnel stating that Darling has been informed that a

18   "copycat product is flooding the market" and that the e-mail recipients should "stop the

19   bleeding" by performing their own tests on the products.  Dkt. 73-8.  In reference to Green's

20   Chinese paper, Mr. Silver stated in an attached letter to these e-mails that an unidentified firm

21   has "done their best to create products that are confusingly similar to ours."  Dkt. 73-11.  The

22   letter also stated that "lives could depend on the tactical notes that they couldn't record or turned

23   illegible into mush."  *Id.*  Finally, the letter stated that soldiers in the field thought they were

24

1   buying Darling products but instead had unintentionally bought Green's notebooks and were

2   dissatisfied with the quality.  *Id*.

3          Also, around May 2011, MSS employees delivered a letter, referred to as an action item,

4   to AAFES stores, which included statements that Green's paper product "has such substandard

5   qualities, that it can be considered dysfunctional."  Dkt. 73-12.  The action item also stated that

6   "failure to secure such notes can lead to compromising a mission."  *Id*.  It further stated that

7   Green markets its all-weather notebooks to look exactly like Darling's.  *Id*.  It directed field

8   personnel to encourage AAFES store managers to remove Green's notebooks from store shelves

9   and request no replenishment orders.  *Id*.  Another MSS employee generated and circulated a

10  script for meetings with AAFES store managers.   Dkt. 73-13.  The script states that "offering

11  this knockoff product to the troops can potentially compromise a mission and virtually put lives

12  at risk."  *Id*.  It requests that store managers ensure troops are not offered "such a misleading

13  product."  *Id*.  On June 3, 2011, Darling's Co-President, Silver, emailed a senior buyer at

14  AAFES, Paul Atherton, referencing their earlier discussion about "the Chinese replica issue."

15  Dkt. 73-14.  Mr. Silver stated that "(o)ur feedback from soldiers, officers and our own testing is

16  that the Chinese product significantly underperforms and will result in-situ field failure."  *Id*.

17         On or about June 13, 2011, Mr. Silver sent a letter and a video to Mr. Atherton.  Dkt. 73-

18  15.  Mr. Silver stated that soldiers purchased the Green's notebooks thinking they were

19  purchasing Darling's notebooks but were disappointed.  *Id*.   In addition, Mr. Silver stated that

20  Green's paper "begins to degrade" after a few minutes after soaking in water.  *Id*.

21         **6.  Tests Comparing Green's and Darling's Paper**

22         Sometime after Green obtained its new source of Chinese paper, Darling conducted an

23  internal test comparing Green's and Darling's waterproof quality and found that Green's paper

24

did not qualify as weatherproof or waterproof.  Dkt. 60, at 6.  Also, in May 2011, Green hired an independent laboratory to test the quality of its new Chinese paper.  Dkts. 58-9, at 6-9; 58-11, at 9.  The laboratory found that the writing on all tests was legible and no tearing was noted when exposed to water.  Dkt. 58-11, at 6.  In September 2011, as a result of AAFES's own test, AAFES found Darling's paper "acceptable" and Green's Chinese paper "swollen, frayed, and appeared fragile to the touch."  Dkt. 61-5, at 17.  At some point thereafter, AAFES stopped buying Green's notebooks and instead bought Darling's notebooks.  Dkt. 61-1, at 49.

## II.   PROCEDURAL HISTORY

On September 29, 2011, Green filed a complaint against Darling alleging false marking under the Patent Act, 35 U.S.C. §292 (Count I); unfair competition in violation of the Lanham Act, 15 U.S.C. §1125(a) (Count II) and in violation Washington's Consumer Protection Act, RCW 19.86 (Count III); and business defamation (Count IV).  Dkt. 1.  Green claims that Darling (1) knowingly marked its '940 patent on Green's notebooks rather than individual sheets, despite Darling being denied patent claims covering books and notepads comprising a plurality of weatherproof sheets, in order to deceive the public and cause harm to Green; (2) suppressed competition by intentionally misrepresenting that its '940 patent covers Green's notebook products; and (3) knowingly made false and defamatory statements about Green's notebook products to retailers and military exchanges, causing injury to Green's business.  Dkt. 1.

On November 11, 2011, Darling filed a Motion to Dismiss for failure to state a claim.  Dkt. 13.  On December 25, 2011, the Court denied Darling's Motion.  Dkt. 21.

On December 19, 2011, Darling filed an answer and five counterclaims against Green.  Dkt. 22.  Darling alleges three violations of the Lanham Act, 15 U.S.C. § 1125 (Counts I-III), and two violations of Washington's Consumer Protection Act, RCW 19.86 (Counts IV and V).

1    Specifically, Darling alleges under Count I that Green's STORM SAF products are not

2    waterproof as advertised, thereby deceiving the public and injuring Darling.  Under Count II,

3    Darling alleges that Green omitted the place of origin of China on Green's STORM SAF

4    products, thereby deceiving consumers and injuring Darling.  Under Count III, Darling alleges

5    that Green placed its corporate address of Providence, Rhode Island, on its products, thereby

6    deceiving consumers and injuring Darling.  Dkt. 22, at 11-13.  Count IV mimics Count I, but

7    alleges violation of Washington law, and Count V mimics Counts II and III, but alleges violation

8    of Washington law.

9         On April 16, 2012, Darling filed its First Amended Answer and Counterclaims, adding

10   two more counterclaims of trademark infringement under 15 U.S.C. § 1125(a) and Washington

11   State common law (Counts VI and VII).  Under Count VI, Darling alleges that Green uses a copy

12   or colorable imitation of Darling's STORM SAF trademark.  Count VII mimics Count VI, but

13   alleges violation of common law.

14                        III.    CONTESTED FACTS

15        1. There is a dispute over whether Darling falsely marked its notebooks by placing the

16   '940 patent marking on the back of the notebooks rather than on each individual sheet.

17        2. Assuming Darling's '940 patent placement is false, there is a dispute over whether

18   Darling knew this was a false placement. Green argues that Darling knew the placement was

19   false because the US Patent and Trademark Office denied Darling's patent claims covering

20   books and notepads comprising a plurality of weatherproof sheets.  Dkt. 1, at 9-10.  Darling

21   states that, upon legal advice and business judgment, it decided in good faith to not mark the

22   individual sheets with its patent but rather mark the notebook's back cover.  Dkt. 59, at 9-10, 20.

23

24

3. There is a dispute over whether Darling marking its '940 patent on the back of the notebooks caused Green to suffer injury.

4. There is a dispute over the quality of Green's waterproof paper.  In September 2011, AAFES found Darling's paper "acceptable" and Green's paper "swollen, frayed, and appeared fragile to the touch."  Dkts. 59, at 12-13; 61-5, at 17.  In May 2011, the laboratory hired by Green found that the writing on all tests was legible and no tearing was noted on its paper.  Dkts. 58, at 12; 58-11, at 6.  Darling conducted an internal test comparing Green's and Darling's waterproof quality and found that Green's paper did not qualify as weatherproof or waterproof.  Dkt. 60, at 6.

5. There is a dispute over whether the representations made by MSS, the exclusive vendor of Darling's products to military exchanges, can be imputed to Darling under an agency theory.  The parties dispute the degree of control Darling had over MSS.

6. There a dispute over the assignment of the STORM SAF trademark and who had control over the trademark.  Darling argues that, in the January 2010 secured party purchase, Brigade assigned all trademark rights to Green except STORM SAF (Dkts. 58-10, at 2-4; 71-2, at 3-7), and Darling had effective control over the trademark (Dkt. 70, at 23).  Green argues that Brigade at all times owned the STORM SAF trademark, had effective control over the trademark, and eventually assigned the trademark rights to Green.  Dkt. 58, at 22.

7. There a dispute over injury caused by Green's mislabeling the country of origin of its notebook product.  The parties dispute when the new 'made in China' stickers were placed on Green's notebooks and how many notebooks eventually had those stickers.

IV.   MOTIONS TO STRIKE

**1. Green's Motions to Strike**

1       Green moves to strike two portions of Darling's Motion for Partial Summary Judgment:

2   (1) references to the document showing AAFES's test results comparing Green's and Darling's

3   waterproof paper (Dkt. 59, at 8) and the document itself (Dkt. 61-5, at 17), because the document

4   is not authenticated and is inadmissible hearsay; and (2) references to settlement discussions

5   between the parties (Dkt. 59, at 8), because reference to settlement discussions is prohibited

6   pursuant to Federal Rule of Evidence 408. Dkt. 72, at 10-11.

7       Darling argues that the Court should not grant Green's Motion to Strike because (1)

8   AAFES's internal test results are authenticated as a business record; and (2) Darling references

9   settlement discussions to show Green's motive for bringing this lawsuit, an exception to Federal

10   Rule of Evidence 408.  Dkt. 90, at 7-8.

11       In its Surreply, Green moves to strike three portions of Darling's Reply in Further

12   Support of its Partial Motion for Summary Judgment (Dkt. 90).  Dkt. 102.  Green argues that the

13   Court should strike (1) the testimony of an AAFES employee regarding the custom and practice

14   of AAFES (Dkt. 91-1, at 1-5) because the employee did not give an adequate evidentiary basis

15   for his opinions; (2) the testimony of Green's President concerning whether Green knew why

16   AAFES stopped buying Green's notebooks (Dkt. 66, at 3-4) because the testimony is inaccurate;

17   and (3) references to (Dkt. 90, at 11) and the document (Dkt. 91-2) showing that Darling filed a

18   divisional application for its '940 patent because that document is a continuation application, not

19   a divisional one, and Darling already admitted it did not file a divisional application.  Dkt. 102.

20   **2. Darling's Motions to Strike**

21       Darling requests that the Court strike three portions of Green's Response to Darling's

22   Motion for Partial Summary Judgment:  (1) references to documents showing internal MSS e-

23   mails (Dkt. 72, at 6, 23-24) and the documents themselves (Dkts. 73-12; 73-13), because they are

24

1    not properly authenticated and are inadmissible hearsay; (2) references to the document

2    containing testimony of Green's President regarding why AAFES bought Darling's products

3    (Dkt. 72, at 19) and the document itself (Dkts. 73-4, at 12-13), because the testimony is hearsay;

4    and (3) references to the document containing testimony of Green's damages expert (Dkt. 72, at

5    10) and the document itself (Dkt. 84), because the expert did not set forth the factual basis for her

6    opinions.  Dkt. 90, at 5-7.

7           In Green's Opposition to Defendant J.L. Darling Corp.'s Motion to Strike, Green argues

8    that (1) the internal MSS e-mails are authenticated and are not inadmissible hearsay because

9    MSS is an agent of Darling; (2) Darling waived its hearsay challenge to the testimony of Green's

10   President recounting why AAFES bought Darling's products because Darling used this exact

11   evidence in its Motion for Partial Summary Judgment (Dkt. 59, at 7); and (3) Green's damages

12   expert adequately articulates the foundation for her conclusions.  Dkt. 100, at 2-7.

13          In its Surreply, Darling argues that the Court should strike (1) Green's Opposition in total

14   (Dkt. 100) because it is not a proper surreply; (2) the Declaration of Brigade's President

15   concerning Darling's control over the STORM SAF trademark (Dkt. 88, at 2-3) because it is

16   inconsistent with other testimony; (3) the Declaration of Brigade's President concerning the state

17   of mind of Green and Branch Banking and Trust Company (Dkt. 88, at 4) because Brigade's

18   President does not have personal knowledge of this information; and (4) the Declaration of

19   Brigade's President referring to a document showing a subsequent trademark assignment (Dkt.

20   88, at 4-5) because this legal document has not been produced in discovery.  Dkt. 101.

21                      V.    <u>DISCUSSION OF MOTIONS TO STRIKE</u>

22          "A trial court can only consider admissible evidence in ruling on a motion for summary

23   judgment."  *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). "In a summary

24

judgment motion, documents authenticated through personal knowledge must be 'attached to an affidavit that meets the requirements of [Fed.R.Civ.P.] 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence.' [citation omitted]  However, a proper foundation need not be established through personal knowledge but can rest on any manner permitted by Federal Rule of Evidence 901(b) or 902." *Id*. at 773-74. "In the absence of a procedural rule or statute, hearsay is inadmissible unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a hearsay exception under Rules 803, 804 or 807." *Id.* at 778.

1. The document showing AAFES test results comparing Darling's and Green's waterproof paper is an AAFES business record authenticated by the affidavit of an AAFES employee, Dennis Walker.  Therefore, the Court should not strike the AAFES test results (Dkt. 61-5, at 17) or reference to them.

2. The reference to settlement discussions (Dkt. 60, at 7) should be stricken pursuant to Federal Rule of Evidence 408.  Motive evidence showing why a party brought a lawsuit is not sufficient to overcome the prohibition on referencing settlement discussions.

3. The reference to the testimony of an AAFES employee regarding the custom and practice of AAFES (Dkt. 91-1, at 1-5) should not be stricken because the testimony provides an adequate evidentiary basis to support the employee's opinions.

4. The reference to the testimony of Green's President concerning whether Green knew why AAFES stopped buying Green's product (Dkt. 66, at 3-4) should not be stricken because of any alleged inaccuracies in the testimony.

5. The reference to the document purporting to show that Darling filed a divisional application for its '940 patent (Dkt. 90, at 11) and the document itself (Dkt. 91-2) should be

1   stricken because Darling has already admitted that it did not file a divisional application and the

2   purported document is not what it claims to be.

3       6. The internal MSS e-mails (Dkts. 73-12; 73-13) were produced pursuant to a subpoena

4   and contain sufficient information for authentication.  Because there is an issue of fact over

5   whether MSS is an agent of Darling, the Court cannot determine on summary judgment whether

6   the e-mails contain admissible hearsay pursuant to Federal Rule of Evidence 801(d)(2)(C).

7   Therefore, reference to these e-mails should not be stricken.

8       7. The testimony of Green's President regarding why AAFES bought Darling's products

9   (Dkt. 73-4, at 12-13) is inadmissible hearsay, and the hearsay challenge was not waived by

10  Darling because Darling did not discuss this testimony as Green claims Darling did.  Therefore,

11  the Court should strike reference to the testimony of Green's President at Dkt. 73-4, at 12-13.

12      8. Green's damages expert laid a sufficient foundation for her opinions and conclusions,

13  and therefore reference to her testimony should not be stricken.

14      9. Local Rule 7(g) for the Western District of Washington provides that "[r]equests to

15  strike material contained in or attached to submissions of opposing parties shall not be presented

16  in a separate motion to strike, but shall instead be included in the responsive brief, and will be

17  considered with the underlying motion. The single exception to this rule is for requests to strike

18  material contained in or attached to a reply brief, in which case the opposing party may file a

19  surreply requesting that the court strike the material . . . ."  Green's Opposition (Dkt. 100) is a

20  separate response to Darling's motion to strike (Dkt. 90).  Green already properly filed a

21  Surreply.  Dkt. 101.  Therefore, Green's Opposition (Dkt. 100) should be stricken.

22      10. The Declaration of Brigade's President concerning Darling's control over the

23  STORM SAF trademark (Dkt. 88, at 2-3) should not be stricken merely because Darling claims

24

1   that the declaration is inconsistent with other testimony of Brigade's President.

2          11. The Declaration of Brigade's President concerning the state of mind of Green and

3   Branch Banking and Trust Company (Dkt. 88, at 4) should not be stricken because Brigade's

4   President does not actually provide any statements regarding the state of mind of any party in

5   that portion of his Declaration.

6          12. The Declaration of Brigade's President referring to a document showing a subsequent

7   trademark assignment (Dkt. 88, at 4-5) should not be stricken because this legal document has

8   been produced in discovery (Dkt. 58-10), contrary to Darling's proffered reason for excluding it.

9                    VI.    MOTIONS FOR SUMMARY JUDGMENT

10         On August 28, 2012, Green filed a Motion for Summary Judgment and Darling filed a

11  Motion for Partial Summary Judgment.  Dkts. 58 and 59.

12  **1.   Darling's Motion for Partial Summary Judgment**

13         Darling argues that it is entitled to summary judgment on all of Green's claims as well as

14  Counts II and III of Darling's claims.  Dkt. 59.  As to Green's False Patent Marking, Lanham

15  Act, and Washington Consumer Protection Act claims (Counts I, II, and III), Darling argues that

16  Green fails to raise an issue of fact over whether (1) the patent label placement on Darling's

17  notebooks is false; (2) Darling intended to deceive consumers through its patent label placement;

18  (3) Darling placed its patent label in bad faith; and (4) Green has suffered damages.  Dkt. 59, at

19  11.  As to Green's business defamation claim (Count IV), Darling argues that the claim is

20  actually for product disparagement, and Green has not shown (1) that the statements caused

21  damages; (2) that Darling is legally responsible for statements made by MSS; and (3) that the

22  statements made were not privileged.  Dkt. 59, at 22.  As to Darling's Lanham Act claims

23  (Counts II and III), Darling argues that there is no issue of fact that Green displayed its

24

1    Providence, Rhode Island address on its notebooks while omitting the proper country of origin

2    from August 2010 to March 2011.  Dkt. 59, at 27.

3         In response, Green argues that there is an issue of fact regarding Green's false patent

4    marking claim (Count I) because (1) Darling knew it had no patent covering books and notepads

5    that comprised a plurality of weatherproof sheets; (2) any good faith or intent to deceive

6    arguments must be determined by the fact finder; and (3) competitive injury is presumed.  Dkt.

7    72, at 20.  As to Green's Lanham Act and Washington Consumer Protection Act claims (Counts

8    II and III), Green argues that (1) Darling improperly stated the law, and thus has not adequately

9    pled for summary judgment on these counts; (2) consumer deception is presumed because

10   Darling falsely marked its notebooks; (3) Green has shown actual damages; and (4) capacity to

11   deceive the public is a question for the fact finder.  Dkt. 72, at 28.  As to Green's business

12   defamation claim (Count IV), Green argues that (1) Darling is liable for MSS's statements under

13   an apparent authority agency theory; (2) any privileged communication is to be determined by

14   the fact finder; and (3) damages are presumed.  Dkt. 72, at 29.  As to Darling's Lanham Act

15   claims (Counts II and III), Green directs the Court to its arguments in Green's Motion for

16   Summary Judgment (Dkt. 58).  Dkt. 72, at 33.

17        In reply, Darling argues that Green (1) has not established that MSS is Darling's agent

18   and therefore cannot prove defamation; (2) has not proved that Green has suffered actual

19   damages from a competitive injury by Darling placing its patent marking on the back of the

20   notebook covers; and (3) has not shown that the alleged defamatory statements caused actual

21   damages.  Dkt. 90.

22        **2.  Green's Motion for Summary Judgment**

23

24

1      Green argues that it is entitled to summary judgment on all of Darling's counterclaims.

2  Dkt. 58.  As to Counts I and IV, Green argues that Darling fails to raise an issue of fact over

3  whether (1) Green's marketing of its notebooks as waterproof is not literally false; and (2)

4  consumers were deceived by the waterproof marketing.  Dkt. 58, at 16.  As to Counts II and V,

5  Green argues (1) that the request for an injunction regarding inadequate labeling of its Chinese

6  notebooks is moot; and (2) Darling did not show injury.  Dkt. 58, at 18.  As to Counts III and V,

7  Green argues that Darling did not show that including Green's address of Providence, Rhode

8  Island, was not a literally true statement.  Dkt. 58, at 21.  As to Counts VI and VII, Green argues

9  that Darling has not shown (1) that Darling has a protectable interest in the STORM SAF

10 trademark; and (2) that consumers are confused by the parties' two notebook versions.  Dkt. 58,

11 at 22.

12      In response, Darling argues that Green is not entitled to summary judgment as to Counts I

13 and IV because there is an issue of material fact over whether Green's marketing of its notebook

14 products as waterproof is literally false.  Dkt. 70, at 13.  As to Counts II and V, Darling argues

15 (1) that an injunction is still appropriate; (2) that Green failed to place the country of origin on its

16 product; and (3) that Darling does not need to show actual injury.  Dkt. 70, at 16.  As to Counts

17 III and V, Darling argues that there is an issue of material fact over whether (1) only placing

18 Green's business address of Providence, Rhode Island, is literally false; and (2) consumers were

19 confused by its placement.  Dkt. 70, at 21.  As to Counts VI and VII, Darling argues that (1)

20 there is an issue of material fact over whether Green, as successor to distributor Brigade, or

21 Darling, as manufacturer, owns the STORM SAF trademark; and (2) there is actual evidence of

22 consumer confusion.  Dkt. 70, at 22.

23

24

1    In reply, Green argues that it is entitled to summary judgment as to Count I because

2    Darling has not shown (1) that Green marketing its notebooks as waterproof is literally false; and

3    (2) a likelihood that consumers were deceived by this marketing.  Dkt. 86, at 7-9.  As to Count II,

4    Green argues that (1) Darling has not shown actual damages in its sales to AAFES; and (2) a

5    request for an injunction is moot because Green adhered the 'made in China' stickers

6    immediately after the Customs and Border Patrol inspection.  Dkt. 86, at 11.  As to Count III,

7    Green argues that Darling has not shown that a significant number of consumers were deceived.

8    Dkt. 86, at 13.  As to Counts VI and VII, Green argues that (1) Darling misstates facts related to

9    Brigade's sale to Green in order to show that Darling, rather than Green, owns the STORM SAF

10   trademark; and (2) Darling has no evidence of consumer confusion over of the parties' two

11   notebook versions.  Dkt. 86, at 13-16.

12                    VII.    <u>SUMMARY JUDGMENT STANDARD</u>

13        Summary judgment is proper only if the pleadings, the discovery and disclosure materials

14   on file, and any affidavits show that there is no genuine issue as to any material fact and that the

15   movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

16   entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17   showing on an essential element of a claim in the case on which the nonmoving party has the

18   burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

19   of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

20   for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21   (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

22   metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

23   material fact exists if there is sufficient evidence supporting the claimed factual dispute,

24

1   requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty*

2   *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

3   *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

4         The determination of the existence of a material fact is often a close question.  The court

5   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

6   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

7   *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

8   of the nonmoving party only when the facts specifically attested by that party contradict facts

9   specifically attested by the moving party.  The nonmoving party may not merely state that it will

10  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

11  to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

12  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

13  be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

14        VIII.   <u>DISCUSSION OF MOTIONS FOR SUMMARY JUDGMENT</u>

15        **Green's Count I**: False Patent Marking, 35 U.S.C. § 292.

16        Green contends that Darling falsely marked its patent by placing it on the STORM SAF

17  notebook back cover rather than on each individual page, that Darling intended to deceive the

18  public by this placement, and that Green was injured as a result.  Darling argues that its patent

19  marking placement is not false, and even if the placement is false, Darling did not know it was

20  false, and Darling acted in good faith.  Also, Darling argues that Green did not show competitive

21  injury.

22        A private party will be successful in a civil action of false patent marking if the claimant

23  can prove that the defendant (1) falsely marked an article with the word 'patent' or similar; (2)

24

1  with the intent to deceive the public; and (3) which resulted in the claimant suffering a

2  competitive injury.  35 U.S.C. § 292(a).  Knowledge that the marking was false creates a

3  rebuttable presumption of intent to deceive the public.  *Pequignot v. Solo Cup Co.*, 608 F.3d

4  1356, 1362-63 (Fed. Cir. 2010).  The presumption can be rebutted by a showing of good faith.

5  *Id.* at 1364.

6          Competitive injury is more difficult to define.  As the parties point out, Congress

7  amended 35 U.S.C. § 292(b) in September of 2011 in order to create a private cause of action

8  only when a competitive injury can be asserted.  *Rogers v. Tristar Products, Inc.*, 2011-1494,

9  2012 WL 1660604, at *3 (Fed. Cir. May 2, 2012).  The purpose of the amendment is to limit

10  abusive litigation and to permit those who have actually suffered a competitive injury to be

11  compensated.  *Id.*  (citing 157 Cong. Rec. S5319–03 at S5320 (Sen.Kyl)).  Congress did not

12  define competitive injury and the Federal Circuit has yet to rule on this new amendment.  The

13  District Court for the Central District of California, however, has ruled on the level of proof

14  required to show competitive injury.  *U.S. Rubber Recycling, Inc. v. ECORE Int'l*, 2011 U.S.

15  Dist. LEXIS 154151 (C.D. Cal. Dec. 12, 2011).  "It is Plaintiff's burden to come forward with

16  evidence that Defendant's false marking was actually the cause of its lost sales."  *Id.* at *14.

17  Causation and proof of lost sales, loss of reputation or goodwill, or inability to freely market or

18  price products are required to survive summary judgment.  *Id.*

19          As noted above, there are contested facts regarding whether the '940 patent marking

20  placement was false, whether Darling knew it was false, and whether Darling acted in good faith.

21  However, Green has not presented an issue of fact regarding competitive injury. Green has

22  presented no facts showing loss of sales, goodwill or ability to market that was *caused* by

23  Darling placing its '940 patent marking on the back of the notebook covers rather than on the

24

1   individual RITR sheets.  This causation is a necessary element of the recent amendments to 35

2   U.S.C. § 292.  Therefore, summary judgment should be granted for Darling on Green's false

3   patent marking claim (Count I).

4        **Green's Count II**: Unfair Competition/Violation of Lanham Act, 15 U.S.C. § 1125(a).

5        Green's contentions and Darling's counterarguments under Green's Lanham Act claim

6   are substantially similar to those under its false patent marking claim above (Count I).

7        "Under the Lanham Act, a prima facie case requires a showing that (1) the defendant

8   made a false statement either about the plaintiff's or its own product; (2) the statement was made

9   in commercial advertisement or promotion; (3) the statement actually deceived or had the

10   tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the

11   defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been

12   or is likely to be injured as a result of the false statement, either by direct diversion of sales from

13   itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product."

14   *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1052 (9th Cir. 2008).  "Even if an

15   advertisement is not literally false, relief is available under [the] Lanham Act . . . if it can be

16   shown that the advertisement has misled, confused, or deceived the consuming public."

17   *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997).  If an

18   advertisement or statement is literally false, then causation and damages are presumed, unless the

19   defendant can show otherwise.  *Id.* at 1146.

20       As noted above, there are contested facts surrounding whether the patent marking's

21   placement was false, whether Darling knew it was false, and whether Green sustained a

22   likelihood of injury.  Because there is an issue of fact on the literal falsity of the '940 patent

23   placement, the Court cannot determine if Green must also show causation and damages.

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT AND MOTIONS TO STRIKE- 18

1  Therefore, the Court should deny summary judgment for Darling as to Green's Lanham Act

2  claim (Count II).

3  **Green's Count III**: Consumer Protection Act Violation, RCW 19.86.

4  Green's contentions and Darling's counterarguments under Green's Consumer Protection

5  Act claim are substantially similar to those under the above false patent marking and Lanham

6  Act claims (Counts I and II).

7  "The five elements of a private Consumer Protection Act action include: (1) an unfair or

8  deceptive act or practice; (2) in the conduct of trade or commerce; (3) which impacts the public

9  interest; (4) injury to the plaintiffs in their business or property; and (5) a causal link between the

10  unfair or deceptive act and the injury suffered." *Mason v. Mortgage Am., Inc.*, 114 Wash. 2d

11  842, 852, 792 P.2d 142, 147 (1990).

12  As noted above, there are contested facts surrounding whether the patent marking's

13  placement was false, whether Darling knew it was false, and whether Green sustained injury.

14  However, Green has not shown any facts demonstrating that Green was injured or will likely be

15  injured *as a result* of Darling placing the '940 patent marking on the back cover of the all-

16  weather notebooks rather than on the individual sheets of RITR paper. Therefore, summary

17  judgment should be granted for Darling on Green's Consumer Protection Act claim (Count III).

18  **Green's Count IV**: Business Defamation/Product Disparagement.

19  It is unclear whether Green aims to bring a claim of business defamation, or a claim of

20  product disparagement, or both.  Under either or both theories, Green contends that Darling

21  made false statements about Green's paper products, causing AAFES to not purchase Green's

22  products, and thereby causing damage to Green's business.  Darling contends that these

23  communications were not false, were privileged as a common interest, were not made by

24

1   Darling, and there is no evidence that AAFES relied on the statements when choosing not to

2   purchase any more of Green's products.

3        The elements a plaintiff must establish in a defamation case are falsity, an unprivileged

4   communication, fault, and damages by a preponderance of the evidence.  *Mohr v. Grant*, 153

5   Wash. 2d 812, 822, 108 P.3d 768, 773 (2005).  To demonstrate fault, a private plaintiff must

6   show that the defendant acted at least negligently in making the false statements.  *Moe v. Wise*,

7   97 Wash. App. 950, 957, 989 P.2d 1148 (1999).

8        To show an unprivileged communication, a plaintiff  must prove that the declarant and

9   the recipient did not have a common interest in the subject matter of the communication.  *Id.*

10  The focus of a common interest analysis is the relationship of the parties to the subject matter,

11  not to each other.  *Id.* at 959.

12       In addition to defamation, "[i]t is the rule that where a statement only disparages the

13  quality of plaintiff's goods, the statement is actionable if special damages are pleaded and

14  proved."  *Waechter v. Carnation Co.*, 5 Wash. App. 121, 126-27, 485 P.2d 1000 (1971). Special

15  damages require a plaintiff to show that disparaging statements were a substantial factor in

16  causing specific injury to plaintiff.  42 A.L.R. 4th 318 § 13 (1985); Restatement (First) of Torts §

17  632 (1938).

18       "On the other hand, it is the rule that defamatory words spoken of a person, which in

19  themselves prejudice him in his profession, trade, vocation, or office, are slanderous and

20  actionable per se unless they are either true or privileged [citations omitted].  A statement may be

21  published in circumstances that violate both of the just cited rules, i.e., it may disparage the

22  quality of the product and at the same time imply the owner or vendor is dishonest, fraudulent, or

23  incompetent, thus affecting the owner or vendor's business reputation.  In such circumstances, an

24

1    action may be brought for defamation as well as for disparagement." *Waechter*, 5 Wash. App. at

2    126-27.

3          Here, Darling does not contend that the alleged defamatory statements are not false.

4    However, there are several contested facts regarding privilege, agency, and fault.  Even if MSS

5    was an agent of Darling and MSS's statement to AAFES can therefore be imputed onto Darling,

6    there are issues of fact concerning whether AAFES is within the common interest of the subject

7    matter of the communications.  Additionally, assuming that MSS was an agent of Darling, there

8    are issues of fact regarding whether Darling and MSS acted negligently in making the false

9    statements because Darling, Green, and AAFES all tested the quality of Darling and Green's

10   paper and arrived at different results.  Further, there is an issue of material fact regarding whether

11   Darling's alleged disparagement caused AAFES to stop purchasing Green's products.  The

12   statements themselves and AAFES's internal testing create inferences showing causation and/or

13   the lack thereof.  Therefore, Green's business defamation and/or product disparagement claims

14   are not appropriate for summary judgment and should be denied.

15         **Darling's Count I**: Lanham Act Violation, 15 U.S.C. § 1125.

16         Darling contends that Green falsely marked its products as waterproof thereby deceiving

17   consumers and causing injury to Darling.  Green contends that its products are waterproof, and

18   that there is no evidence that customers were deceived or that Darling suffered injury.

19         As stated under Green's Lanham Act claim (Count II), if an advertisement or statement is

20   literally false, then causation and damages are presumed, unless the defendant can show

21   otherwise. *Id.* at 1146.

22         As noted above, there are contested facts regarding the quality of Green's paper products

23   as waterproof.  Because there are issues of fact concerning the literal falsity of green's

24

1    waterproof paper, the Court cannot determine if Darling must also show causation and damages.

2    Therefore, the Court should deny summary judgment for Green on Darling's first Lanham Act

3    claim (Count I).

4           **Darling's Counts II and III**: Lanham Act Violation, 15 U.S.C. § 1125(a).

5           Darling contends that Green falsely marked the country of origin, thereby deceiving

6    consumers and causing injury to Green.  Green contends that any mistaken marking of country of

7    origin was remedied and is now moot, and that there is no evidence that customers were

8    deceived or that Darling suffered injury.

9           While there is an issue of fact over when and how many of Green's notebook products

10   eventually received the correct 'made in China' stickers, there is no issue of fact that Green did

11   not place the proper country of origin on its notebook products when it first distributed those

12   products.  Because the lack of sticker placement was a literally false omission, causation and

13   damages are presumed unless Green can rebut this presumption. Green has shown no facts to

14   rebut.  Because Darling and Green both request summary judgment on these two claims,

15   summary judgment should be granted and judgment of liability only entered for Darling, and

16   summary judgment should be denied for Green, on Darling's second and third Lanham Act

17   claims (Counts II and III).

18          **Darling's Count IV and V**: Violation of Washington's Consumer Protection Act, RCW

19   19.86.

20          Darling's contentions and Green's counterarguments under Darling's Consumer

21   Protection Act claims are substantially similar to those under Darling's Lanham Act claims

22   above (Counts I, II, and III).

23

24

1   "The five elements of a private Consumer Protection Act action include: (1) an unfair or

2   deceptive act or practice; (2) in the conduct of trade or commerce; (3) which impacts the public

3   interest; (4) injury to the plaintiffs in their business or property; and (5) a causal link between the

4   unfair or deceptive act and the injury suffered." *Mason v. Mortgage Am., Inc.*, 114 Wash. 2d

5   842, 852, 792 P.2d 142, 147 (1990).

6       As noted above, there are contested facts regarding the marking of Green's paper as

7   waterproof, and whether Darling suffered injury caused by Green not properly marking the

8   country of origin and marking the notebooks as waterproof.  Unlike under the Lanham Act,

9   Washington's Consumer Protection Act contains no presumptions as to causation and damages.

10   Darling has presented no facts showing damages or that Green caused damages. Therefore,

11   summary judgment should be granted for Green on Darling's Consumer Protection Act claims

12   (Counts IV and V).

13       **Darling's Count VI and VII**: Trademark Infringement.

14       It is unclear whether Darling pursues its trademark infringement claim under 15 U.S.C. §

15   1125 or § 1114.  Given that both parties cite to § 1125 but perform an analysis under § 1114, the

16   Court will agree that the analysis should be performed under the framework of § 1114.  Darling

17   contends that Green knowingly infringed upon Darling's ownership of the STORM SAF

18   trademark by selling substantially similar copies of the STORM SAF notebook, thereby

19   deceiving consumers and causing injury to Darling.  Plaintiff argues that it owns the STORM

20   SAF trademark, and even if it does not, there is no evidence that consumers were deceived or

21   that Darling suffered injury.

22       "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. §

23   1114, a party must prove: (1) that it has a protectible [sic] ownership interest in the mark; and (2)

24

1 that the defendant's use of the mark is likely to cause consumer confusion." *Network*

2 *Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

3    "When proving ownership of a trademark, federal registration of the mark is prima facie

4 evidence that the registrant is the owner of the mark. Lanham Act § 7(b), 15 U.S.C. § 1057(b);

5 Lanham Act § 33(a), 15 U.S.C. § 1115(a). Therefore, the registrant is granted a presumption of

6 ownership, dating to the filing date of the application for federal registration, and the challenger

7 must overcome this presumption by a preponderance of the evidence." *Sengoku Works Ltd. v.*

8 *RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 *as modified*, 97 F.3d 1460 (9th Cir. 1996).

9    When there is no clear registrant, courts presume that the manufacturer, in a

10 manufacturer-distributor relationship, owns the trademark. *Id.* at 1220.  "[T]he distributor may

11 rebut the presumption in favor of the manufacturer, and courts look to various factors when

12 determining which party has the superior right of ownership, including:

13    (1) which party invented and first affixed the mark onto the product;

14    (2) which party's name appeared with the trademark;

15    (3) which party maintained the quality and uniformity of the product; and

16    (4) with which party the public identified the product and to whom purchasers made

17    complaints.

18    Furthermore, courts will also consider which party possesses the goodwill associated with

19 the product, or which party the public believes stands behind the product." *Id.*

20    In addition to the trademark ownership factors, there are eight factors that courts weigh in

21 determining whether consumers would likely be confused by related goods: "[1] strength of the

22 mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion;

23 [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by

24

1  the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the

2  product lines." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145

3  (9th Cir. 2011).

4          Here, there is no evidence showing that Brigade or Darling has a federal registration to

5  the STORM SAF trademark.  As noted above, there are contested facts regarding who controlled

6  the STORM SAF trademark, whether consumers were confused by the two notebooks now on

7  the market, and whether Darling suffered injury.  The contested facts preclude summary

8  judgment on Darling's Counts VI and VII.

9

10         Therefore, it is hereby **ORDERED** that

11         Green's Motions to Strike are **GRANTED IN PART** and **DENIED IN PART** for the

12  purposes of this summary judgment order only.  The Court will strike reference to settlement

13  discussions (Dkt. 60, at 7), and reference to the document purporting to show Darling's

14  divisional patent application (Dkt. 90, at 11) and the document itself (Dkt. 91-2).  Green's other

15  Motions to Strike are denied.

16         Darling's Motions to Strike are **GRANTED IN PART** and **DENIED IN PART** for the

17  purposes of this summary judgment order only.  The Court will strike the testimony of Green's

18  President regarding why AAFES bought Darling's products (Dkt. 73-4, at 12-13), and Green's

19  Opposition (Dkt. 100) to Darling's Motion to Strike.  Darling's other Motions to Strike are

20  denied.

21         Green's Motion for Summary Judgment (Dkt. 58) is **GRANTED IN PART** and

22  **DENIED IN PART**. Darling's Motion for Partial Summary Judgment (Dkt. 59) is **GRANTED**

23  **IN PART** and **DENIED IN PART**. Accordingly,

24

**1.   The following claims are DISMISSED**:

(1) Green's false patent marking claim under 35 U.S.C. § 292 (Count I);

(2) Green's Consumer Protection Act claim under RCW 19.86 (Count III);

(3) Darling's Consumer Protection Act claim under RCW 19.86 (Count IV); and

(4) Darling's Consumer Protection Act claim under RCW 19.86 (Count V).

**2.   Darling is ENTITLED TO JUDGMENT FOR LIABILITY ONLY on the following claims**:

(1) Darling's Lanham Act claim under 15 U.S.C. § 1125(a) (Count II); and

(2) Darling's Lanham Act claim under 15 U.S.C. § 1125(a) (Count III).

**3.   The following claims may PROCEED to trial**:

(1) Green's Lanham Act claim under 15 U.S.C. § 1125(a) (Count II);

(2) Green's business defamation/product disparagement claim (Count IV);

(3) Darling's Lanham Act claim under 15 U.S.C. § 1125(a) (Count I);

(4) Darling's trademark infringement claim under 15 U.S.C. § 1125/1114 (Count VI);

(5) Darling's trademark infringement claim under common law (Count VII);

(6) Darling's Lanham Act claim under 15 U.S.C. § 1125(a) (Count II) as to damages only; and

(7) Darling's Lanham Act claim under 15 U.S.C. § 1125(a) (Count III) as to damages only.

1          The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2   to any party appearing pro se at said party's last known address.

3          Dated this 9th day of October, 2012.

4

5                                        _____

6                                        ROBERT J. BRYAN
                                         United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT AND MOTIONS TO STRIKE- 27